IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TODD G., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   No. 20 C 1863 |
| | ) |
| KILOLO KIJAKAZI, Acting | )   Magistrate Judge Finnegan |
| Commissioner of Social Security,[1] | ) |
| | ) |
|     Defendant. | ) |

## ORDER

Plaintiff Todd G. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the decision. After careful review of the record and the parties' respective arguments, the Court affirms the ALJ's decision.

## BACKGROUND

Plaintiff applied for DIB on April 21, 2017, alleging that he became disabled nearly nine years earlier on August 19, 2008 due to a spinal injury necessitating seven surgeries. (R. 149, 177). Born in March 1971, Plaintiff was 36 years old as of the alleged disability onset date, and 42 years old as of his December 31, 2013 date last insured. (R. 149,

---

[1]   Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

174). He lives alone and is able to take care of himself "[f]or the most part." (R. 36). Plaintiff completed three years of college and a five-year apprenticeship program with a sprinkler fitters local union. (R. 178). Starting in 2003, he worked as a foreman for various sprinkler companies and was ultimately promoted to superintendent at one of them. (R. 44-45). Approximately one and a half years into that job, on August 19, 2008, Plaintiff suffered a workplace injury that led to several neck surgeries. (R. 37-38, 178). He has not engaged in any substantial gainful activity since that date. (R. 178).

The Social Security Administration denied Plaintiff's application initially on June 27, 2017, and again upon reconsideration on September 19, 2017. (R. 62-84). Plaintiff filed a timely request for a hearing and appeared before administrative law judge Diane Davis (the "ALJ") on September 28, 2018. (R. 30). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Kathleen Doehla (the "VE"). (R. 33-61, 230). On January 10, 2019, the ALJ found that Plaintiff's degenerative disc disease of the cervical spine is a severe impairment, but that it did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 at any time prior to the December 31, 2013 date last insured ("DLI"). (R. 15-19). After reviewing the medical and testimonial evidence, the ALJ concluded that from the August 19, 2008 alleged disability onset date through the DLI, Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work involving: occasional balancing, stooping, and climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; and no work at unprotected heights. (R. 19).

The ALJ accepted the VE's testimony that a person with Plaintiff's background and this RFC could perform a significant number of jobs available in the national economy,

including circuit board assembler, address clerk, and final assembler. (R. 24-25). As a result, the ALJ concluded that Plaintiff was not disabled at any time prior to the December 31, 2013 DLI. (R. 25). The Appeals Council denied Plaintiff's request for review on January 22, 2020. (R. 1-5). That decision stands as the final decision of the Commissioner and is reviewable by this Court under 42 U.S.C. §§ 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Whitney v. Astrue*, 889 F. Supp. 2d 1086, 1088 (N.D. Ill. 2012).

In support of his request for reversal or remand, Plaintiff argues that the ALJ: (1) made a flawed RFC determination that did not properly account for his difficulties using his arms and hands, and staying on task; and (2) relied on flawed VE testimony in finding him capable of performing a significant number of sedentary jobs. For reasons discussed in this opinion, the Court finds that the ALJ's decision is supported by substantial evidence.

## **DISCUSSION**

### A.  Standard of Review

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act (the "SSA"). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such

3

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.     Five-Step Inquiry**

To recover disability benefits under the SSA, a claimant must establish that he is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to law for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the

4

claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

**C.    Analysis**

    **1.    RFC Determination**

Plaintiff argues that the case must be reversed or remanded because the ALJ's RFC determination does not recognize his limited ability to use his arms and hands, or address evidence that he would be off-task due to pain, depression, and anxiety.[2] A claimant's RFC is the maximum work that he can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, at *1-2. "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012). It is useful to begin with an overview of Plaintiff's treatment history.

---

[2]    Though Plaintiff's briefs also mention difficulties with neck movement, the substantive argument focuses entirely on arm and hand manipulation. (Doc. 20, at 8-9; Doc. 23, at 1-3). The Court notes that the ALJ accounted for Plaintiff's "limited range of motion in the neck" by restricting him to sedentary work. (R. 23). Plaintiff does not raise any specific challenge to that aspect of the ALJ's decision.

5

    **a.**  **Medical History**

  Plaintiff's neck problems date back to January 2008 when he underwent a cervical fusion at C5-C6 following a non-work related accident. (R. 20, 245). Plaintiff returned to work but on August 19, 2008, he felt a pop in his neck while picking up a pipe valve resulting in a herniated disc at C4-C5 and significant pain. (R. 20, 412). This led to a second surgery, a C4-C5 anterior decompression and fusion performed by orthopedic surgeon Anis O. Mekhail, M.D. in November 2008. (R. 20, 245). Over the next few months Plaintiff went to physical therapy and work conditioning, and by June 2009 he was lifting 90 pounds and was released to medium-to-heavy duty work. (R. 20, 468, 470, 472, 474).

  Despite his apparent improvement, Plaintiff continued to complain of ongoing neck pain, and an August 31, 2009 CT scan showed that there was no solid fusion at C4-C5. (R. 20, 474, 475, 477). On October 1, 2009, Howard S. Konowitz, M.D. conducted an Independent Medical Evaluation of Plaintiff as part of his Workers' Compensation claim. Dr. Konowitz recommended that Plaintiff be evaluated for spinal revision surgery due to the non-fusion and limited him to sedentary work. (R. 697-98). A couple of months later on December 4, 2009, Dr. Mekhail performed a C4-C5 and C5-C6 instrumentation and spinal fusion. (R. 20, 679, 682). Plaintiff developed a severe infection requiring an incision and debridement with hardware removal on December 14, 2009, followed by several weeks of IV antibiotics (Levaquin). (R. 20, 245). The complaints of pain continued so on February 16, 2010, Plaintiff started treating with pain management specialist James M. Kelly, M.D. (R. 246). At that time Plaintiff was taking OxyContin, Oxy IR, Cymbalta, Xanax, and Levaquin. Dr. Kelly increased Plaintiff's dosage of OxyContin and maintained

his dosage of Oxy IR. (*Id*.). On March 16, 2010, Dr. Kelly increased the narcotic regimen by 30%, increased it again on May 25, 2010, then reduced it on July 8, 2010. (R. 249, 258, 264).

By July 12, 2010, Dr. Mekhail concluded that Plaintiff was "at sedentary duty at this point." (R. 21, 390). Imaging tests showed: no significant areas of central canal stenosis or definite areas of neural foraminal stenosis or compression, and no evidence of any problem with the fusion at C3-C4 (March 30, 2010 MRI of cervical spine); no kyphosis or spinal curvature (X-ray of May 20, 2010); no evidence of acute cranial pathology (June 7, 2010 brain MRI); and no evidence of compression (June 2010 CT Myelogram). (R. 21, 258, 384, 388, 389, 490-91). Over the next two years, Plaintiff had regular appointments with Dr. Kelly and Dr. Mekhail with little change in his condition. Dr. Kelly documented no gross motor or sensory deficits in the extremities, made no adjustments to Plaintiff's medications over the course of several years, and routinely described Plaintiff's condition as stable or unchanged with pain levels ranging from marginally to reasonably well controlled. (R. 21, 276, 279, 282, 285, 288, 291, 294, 297, 300, 303, 305, 307, 310, 313, 319, 322, 325, 328, 331, 334, 337, 340, 343, 346, 349, 352).

Beginning in 2013, Plaintiff primarily treated with Dr. Kelly and reduced his visits with Dr. Mekhail to once a year. As before, Dr. Kelly made no changes to Plaintiff's medications. (R. 356, 358, 359, 362, 364, 366, 368, 370). On October 21, 2013, Dr. Mekhail stated that Plaintiff had been doing well over the past year or so. (R. 405). In the year following the December 31, 2013 DLI, Plaintiff had three appointments with Dr. Kelly in February, April, and June 2014. Plaintiff's symptomology and medication regimen remained unchanged. (R. 372, 373, 376). Then on March 9, 2015, an MRI showed a

7

shallow posterior disc protrusion with uncovertebral osteophytosis resulting in mild central spinal canal narrowing and bilateral foraminal narrowing at C6-C7. (R. 451-52). Eight months later, on November 20, 2015, Dr. Mekhail performed a C6-C7 anterior cervical decompression and fusion. (R. 438-40).

### b. Plaintiff's Arguments

As noted earlier, the ALJ found that prior to the December 31, 2013 DLI, Plaintiff was capable of sedentary work involving: occasional balancing, stooping, and climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; and no work at unprotected heights. (R. 19). Plaintiff argues that this RFC is flawed because he cannot use his hands for fine and gross manipulation more than occasionally, and would be off-task 15% or more of the workday due to pain, depression, and anxiety. (Doc. 20, at 8-10). Plaintiff cites the VE's testimony that a person with these restrictions would not be capable of performing any jobs. (*Id*.) (citing R. 57-58). Yet Plaintiff fails to identify a single physician who limited him to occasional hand manipulation or opined that he would be off-task for any amount of time during the workday. To the contrary, Drs. Konowitz and Mekhail both concluded on October 1, 2009 and July 12, 2010, respectively, that Plaintiff was able to do sedentary work. (R. 20, 21, 390-91, 698).

Plaintiff objects that the ALJ ignored other statements from the doctors' records showing manipulative deficits that are inconsistent with sedentary work. Specifically, Dr. Konowitz noted that Plaintiff's sharp touch was decreased on the dorsal surface of the left hand (R. 692), and Dr. Mekhail documented "decreased sensation but no significant weakness in the upper or lower extremities." (R. 391; Doc. 20, at 9; Doc. 23, at 2). In Plaintiff's view, these observations corroborate similar findings from Dr. Kelly regarding

8

hand and arm weakness. For example, during his initial evaluation with Dr. Kelly on February 16, 2010, Plaintiff exhibited pain with both active and passive flexion and extension at the knees, hips, wrists, fingers, and elbows, and to a lesser extent the hips and shoulders. (R. 246). Dr. Kelly also observed mild swelling of the joints of the fingers. (*Id*.). And on December 26, 2013, Dr. Kelly diagnosed Plaintiff with "brachial neuritis/radiculitis." (R. 370; Doc. 20, at 9; Doc. 23, at 2).

To begin, the ALJ expressly acknowledged Dr. Kelly's observation of swelling in the small joints of the hands and fingers in March 2010, but correctly stated that the swelling had resolved by April 2010. (R. 18, 249, 252). The ALJ also discussed references to complaints of hand numbness but found them unsupported by physical exams and diagnostic imaging showing: no central canal narrowing or neural foraminal stenosis (R. 490-91, March 30, 2010 MRI of cervical spine); no significant motor weakness (R. 385, May 20, 2010); normal strength, symmetrical reflexes in the upper extremities, and normal pin sensation (R. 387, May 26, 2010); decreased sensation but no significant weakness in the upper or lower extremities and normal reflexes in the upper extremities (R. 391, July 12, 2010); and no motor or sensory deficits in the upper extremities from December 29, 2011 through at least June 12, 2014. (R. 17, 322, 325, 334, 343, 346, 349, 352, 356, 358, 359, 362, 364, 366, 368, 370, 376). Contrary to Plaintiff's suggestion, the ALJ did not "play doctor" in reaching this conclusion but relied on a March 18, 2016 Independent Medical Evaluation performed by Jerry Bauer, M.D. (R. 17-18). After reviewing all of the diagnostic tests conducted from 2008 through April 2015, Dr. Bauer opined that an April 20, 2015 MRI was the first scan to reflect cervical stenosis that could account for Plaintiff's symptoms. (R. 699).

9

Plaintiff does not address Dr. Bauer's report or explain how any of the cited records demonstrate that prior to the DLI he could only occasionally perform hand manipulations. Instead, he suggests that his complaints are supported by the fact that Dr. Kelly diagnosed him with brachial neuritis/radiculitis, a form of peripheral neuropathy characterized by pain and weakness from atrophy. (Doc. 23, at 2). But "[Plaintiff] having been diagnosed with these impairments does not mean they imposed particular restrictions on h[is] ability to work. . . . It was [Plaintiff]'s burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting h[is] capacity to work." *Weaver v. Berryhill*, 746 F. App'x 574, 578-79 (7th Cir. 2018). Plaintiff has failed to make such a showing in this case given that no physician of record imposed any specific manipulative limitations. *See Richards v. Berryhill*, 743 F. App'x 26, 30 (7th Cir. 2018) (affirming RFC determination where the plaintiff "just lists a variety of symptoms (such as pain in her extremities and headaches)" because "pointing to various diagnoses and complaints and saying that they might hinder [the plaintiff] is insufficient to establish the existence of a functional limitation."); *Ivair M. v. Berryhill*, No. 18 C 3884, 2019 WL 2085139, at *4 (N.D. Ill. May 13, 2019) ("Instead of pointing to any specific errors in the RFC, Plaintiff recites his diagnosis, treatment, and complaints. But this does not establish work-related limitations or show that the ALJ should have included additional limitations in the RFC.").

Turning to the issue of off-task time, Plaintiff notes that Dr. Konowitz's October 1, 2009 evaluation made clear that Plaintiff suffered from chronic narcotic tolerance, depression, an anxiety disorder, and poor skills coping with pain, and "will need to address his narcotic issues." (R. 695, 698). Plaintiff says these conditions could cause him to be

off-task, something the ALJ failed to consider. (Doc. 20, at 10; Doc. 23, at 4). The Court disagrees. The ALJ acknowledged the evidence of depression but also noted that Plaintiff routinely denied having any associated difficulties. (R. 16) (citing R. 250, 253, 256, 259, 262, 265, 268, 271, 274, 277, 280, 283, 286, 289, 292, 295, 297, 301, 304, 306, 308, 311, 314). In addition, there is no mention of anxiety in the medical records after December 1, 2011. (R. 319). With respect to pain, the ALJ found it significant that Dr. Kelly documented fair pain control and did not make any changes to Plaintiff's narcotics medications for years. (R. 21). The mere fact that Plaintiff told Dr. Konowitz on October 1, 2009 that he was experiencing deep and aching pain and fatigue (R. 696), is not evidence of any specific functional limitations. (Doc. 20, at 10). No physician of record indicated that Plaintiff would be off-task for any amount of the workday, much less a work-preclusive 15% of each day, and the ALJ did not err in excluding such a limitation from the RFC determination.[3]

Finally, the Court finds no merit to Plaintiff's suggestion that he could not perform sedentary work prior to the December 31, 2013 DLI because Dr. Konowitz opined on October 1, 2009 that he had not yet reached maximum medical improvement ("MMI"). (Doc. 20, at 9) (citing R. 698). The VE did testify that certified rehabilitation counselors such as herself typically do not try to place people in jobs before they have reached MMI (R. 59), but Dr. Mekhail found that Plaintiff was at MMI as of September 13, 2010, meaning he could perform sedentary work. (R. 390, 393).

---

[3] Plaintiff does not challenge the ALJ's finding that prior to the December 31, 2013 DLI he did not have a severe mental impairment and had no more than mild limitations in each area of functioning. (R. 16).

11

Absent medical evidence establishing that prior to the December 31, 2013 DLI Plaintiff was limited to occasional hand manipulations and would be off-task for more than 15% of the workday, Plaintiff is left with his own testimony. Plaintiff did not make a specific challenge to the ALJ's subjective symptom evaluation in his opening brief but in responding to Defendant's arguments, he disputes that certain of his daily activities undermine his complaints of disabling limitations. (Doc. 23, at 3-4).

In evaluating a claimant's subjective symptom allegations, an ALJ must consider several factors including: the objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication; treatment and other measures besides medication taken to relieve pain or other symptoms; and functional limitations due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8 (Oct. 25, 2017). "'An ALJ need not discuss every detail in the record as it relates to every factor,' but an ALJ may not ignore an entire line of evidence contrary to her ruling." *Benito M. v. Kijakazi*, No. 20 C 5966, 2022 WL 2828741, at *8 (N.D. Ill. July 20, 2022) (quoting *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022)). "As long as an ALJ gives specific reasons supported by the record, [the Court] will not overturn a credibility determination unless it is patently wrong." *Grotts*, 27 F.4th at 1279; *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). "Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence." *Grotts*, 27 F.4th at 1278.

The ALJ offered several valid reasons for discounting Plaintiff's allegations of disabling symptoms. As discussed previously, the ALJ found that the objective medical evidence did not support greater limitations than those set forth in the RFC. (R. 21). *See Thorps v. Astrue*, 873 F. Supp. 2d 995, 1006 (N.D. Ill. 2012) (citing *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[A] patient's subjective complaints are not required to be accepted insofar as they clashed with other, objective medical evidence in the record."). The ALJ also noted that Dr. Kelly reported fair pain control with no significant side effects from medications, and he did not adjust those medications for years. (*Id.*). *See Hughes v. Saul*, No. 18 C 0378, 2019 WL 4744902, at *9 (W.D. Wis. Sept. 30, 2019) ("The ALJ did not err by noting the absence of [objective] findings–along with notes reporting pain control with medication–as indicators that Hughes's pain was not as limiting as she alleged."). In addition, Dr. Mekhail opined in June 2010 that Plaintiff's "symptoms are completely out of proportion to his condition." (R. 21, 389).

With respect to daily activities, the ALJ discussed the fact that Plaintiff has lived alone since the alleged disability onset date and has independently maintained his household, including preparing simple meals, doing laundry, vacuuming, loading the dishwasher, feeding and occasionally walking the dog, walking to a neighbor's house to socialize, occasionally going to a car show, driving up to an hour and a half (after which he needs to stand and stretch), shopping, and using a riding lawn mower (though the jostling can exacerbate pain). In addition, Plaintiff was able to travel to the Dominican Republic and sit on a boat while his son went scuba diving. (R. 21). "Daily activities are a proper factor for an ALJ to consider, . . . and when those activities are not consistent with a claimant's testimony about his limitations, an ALJ can take that into account."

13

*Rockey v. Kijakazi*, No. 1:21-CV-064-JD-SLC, 2022 WL 1553428, at *3 (N.D. Ind. May 17, 2022) (citing *Pepper*, 712 F.3d at 368).

Contrary to Plaintiff's assertion, the ALJ adequately considered limitations in how Plaintiff performed his activities and reasonably found them inconsistent with his allegations of disabling pain, hand limitations, and focus deficits that precluded all work prior to December 31, 2013. An ALJ's credibility assessment "need not be perfect; it just can't be patently wrong." *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013)). And "[a]s the Supreme Court observed fairly recently, substantial evidence is not a high standard, and requires only evidence that 'a reasonable mind might accept as adequate.'" *Richard C. v. Saul*, No. 19 C 50013, 2020 WL 1139244, at *5 (N.D. Ill. Mar. 9, 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). Here, the ALJ provided enough valid reasons for discounting Plaintiff's complaints of disabling symptoms and that decision is supported by substantial evidence.

Viewing the record as a whole, the ALJ did not commit reversible error in determining Plaintiff's RFC and the case need not be remanded for further consideration of this issue.

### 2. VE Testimony

Plaintiff argues that the case still must be reversed or remanded because the ALJ erred in accepting the VE's testimony that there are a significant number of jobs available to a person with Plaintiff's background and RFC. In response to hypothetical questions from the ALJ, the VE identified three positions from the Dictionary of Occupational Titles ("DOT") that Plaintiff could perform: circuit board assembler (48,000 jobs nationally),

address clerk (56,000 jobs nationally), and final assembler (30,000 jobs nationally), for a total of 134,000 jobs.[4] (R. 56-57). Plaintiff first objects that the actual number of jobs is much lower than 134,000 based on information his counsel apparently reviewed on SkillTRAN Job Browser Pro ("SkillTRAN). Specifically, Plaintiff argues that the circuit board assembler job is light as opposed to sedentary duty and so should be eliminated. (Doc. 20, at 10-11). In addition, Plaintiff claims that 27.4% of the address clerk jobs, and 11.8% of the final assembler jobs are only part-time. By Plaintiff's estimate, this means there are only 47,918 address clerk positions and 26,460 final assembler positions available to him. (*Id*. at 11). This reduces the total number of available jobs from 134,000 to 74,378. (*Id*.). In Plaintiff's view, either number is too small to meet the Defendant's burden at step five of the sequential analysis.[5] This Court disagrees.

To begin, Plaintiff does not provide any citations to the SkillTRAN database or explain how he or his counsel determined that the job numbers should be reduced by various percentage amounts. Plaintiff also failed to raise this issue during the administrative hearing. Though he challenged the VE's numbers to the Appeals Council, he said nothing about SkillTRAN. (R. 241). In such circumstances, Plaintiff has forfeited this objection. *See Coyier v. Saul*, 860 F. App'x 426, 428 (7th Cir. 2021) ("Because

---

[4] The Court notes that the ALJ misstated the number of address clerk jobs as 66,000 instead of 56,000. (R. 25). For reasons discussed below, this error does not affect the outcome of the case and is therefore harmless. *Wilder v. Kijakazi*, 22 F.4th 644, 654 (7th Cir. 2022) (an error is harmless if the ALJ would have reached the same result even without the error).

[5] Neither party has addressed the issue of whether an ALJ may rely on part-time work in deciding whether a significant number of jobs exist in the national economy. There is some case law suggesting that part-time jobs are relevant at step five. *See Michael L. v. Kijakazi*, No. 19 C 7566, 2022 WL 2316202, at *3 n.4 (N.D. Ill. June 28, 2022) (collecting cases). This Court need not resolve the question since, as discussed below, Defendant has met her burden of identifying a significant number of jobs even without considering the part-time positions.

15

counsel failed to develop an argument or question the VE . . . about his methodology, the ALJ was entitled to rely on the job-number estimates.").

Even assuming Plaintiff did not waive the argument, the Court is not convinced by Plaintiff's assertion that either 74,378 jobs or 134,000 jobs is insignificant. Plaintiff relies on a single case, *Sally S. v. Berryhill*, No. 2:18-CV-460, 2019 WL 3335033 (N.D. Ind. July 23, 2019), to support his view that both numbers are too small. (Doc. 20, at 11; Doc. 23, at 5). It is true that the *Sally S.* court found that 120,350 jobs nationally was not a significant number on which to deny disability benefits. *Id*. at *11. But the Seventh Circuit has concluded that 140,000 representative jobs in the national economy was "*well above the threshold for significance,*" *Weatherbee v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011) (emphasis added), and other district courts have found that far fewer numbers satisfy the threshold. *See, e.g., Zych v. Comm'r of Soc. Sec.*, No. 1:20-CV-00414-SLC, 2021 WL 5319880, at *5 (N.D. Ind. Nov. 16, 2021) ("41,000 jobs in the national economy is a 'significant number' of jobs"); *Dorothy B. v. Berryhill*, No. 18 C 50017, 2019 WL 2325998, at *7 (N.D. Ill. May 31, 2019) (17,700 jobs nationally a significant number); *Joseph M. v. Saul*, No. 18 C 5182, 2019 WL 6918281, at *17 (N.D. Ill. Dec. 19, 2019) (same for 40,000 jobs nationally). Moreover, other circuits that have considered the issue have similarly found that smaller national job numbers qualify as "significant." *See Sanchez v. Comm'r of Soc. Sec.*, 705 F. App'x 95, 99 (3d Cir. 2017) (18,000 jobs nationally is significant); *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (10,000 jobs nationally is significant).

Plaintiff does not address any case besides *Sally S.*, and absent controlling authority that either 74,378 or 134,000 jobs in the national economy is not significant, this

16

Court finds that both numbers suffice to meet Defendant's burden at step five. Plaintiff's request to remand the case for further analysis of this issue is denied.

## CONCLUSION

For the reasons stated above, Plaintiff's request to reverse or remand the ALJ's decision is denied, and the Commissioner's motion for summary judgment [21] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

Dated: July 25, 2022

ENTER:

*Sheila Finnegan*

_____
SHEILA FINNEGAN
United States Magistrate Judge